Good morning, and may it please the Court. Ajay Krishnamoorthi for the United States. With the Court's permission, I'll attempt to reserve two minutes of my time for rebuttal. The district court suppression order here should be reversed because there exists a particularized and objective basis for suspecting the defendants of being involved in criminal activity. As an initial matter, weeks of near-constant surveillance established the G Street house was a stash house for undocumented aliens. That much was evident from the agent's observation of a frequent flow of visitors that came but did not leave, as well as caretakers who brought in mattresses and food to that house. That same surveillance also established that the organization associated with that particular house was using Route S2, which is a lightly traveled, lightly policed smuggling route going from Brawley into the interior of the United States. So it was against that backdrop that Border Patrol agents saw the defendants. Counsel, didn't the agents decide to stop the car and order it stopped before they got to the S2? Correct. So they made the determination to call for the stop when the car was heading west. So don't we have to consider what the agents knew before they reached the S2? No, Your Honor. It's a bedrock principle of Fourth Amendment law that the circumstances that the courts considered the objective circumstances as they existed at the time of the seizure. So at ER 63 and 67, Border Patrol Agent Harwin testified that even though they got the call when they were on I-8, they didn't catch up with the car and make the seizure until they were on S2. Counsel, since there are so few routes out of that area into Los Angeles, had to take the S2, they had to take, I think it was the 111, or they had to take the I-8 all the way over to something else, I don't know, what, the I-5 or something? Correct. So they could have gone all the way west. There's really only about three routes to get there, which really limits the number of options here. If they stay on the I-8, then wouldn't the agents be entitled to conclude that they were taking it over to the I-5 and then north to Los Angeles? Or that they were going to take the 111? I mean, they're sort of trapped any way they go. I take the Court's point that many of the highways in Southern California are considered smuggling routes. But I think this Court has sort of squarely rejected the argument that just because there are a number of smuggling routes in Southern California, that precludes a court from giving weight to any route that a defendant is on. And in this case, I think the facts are a little bit more particular than that. S2 is not a major highway. It is a two-lane road. And Border Patrol agents knew that the smuggling organization connected to that particular house had used S2 just the week before. So I think that provides a little bit more basis than what the Court is suggesting. But really, you have lots of evidence that there was a smuggling house going on, the defendant's vehicle at that place, and then the defendant using S2. That's it? Correct. That's enough? Yes, Your Honor. And there is one other set of facts that was contained in the report but not elicited at the hearing, which is the defendant's sort of suspicious interactions once they got to the house. But there's no articulation of those suspicious activities that actually makes it anywhere other than they saw him go in and out of the house. There's no finding that that was somehow suspicious, nothing. That is true. And I understand the Court's reluctance to rely on those facts given the lack of development below. But briefly, I'll just say that those facts were undisputed. But even if all the... But the suspicious facts are somebody talking to somebody else. Correct. But in Terry v. Ohio, of course, the predicate activity was just two people walking back and forth in front of a store. So this doesn't seem all that dissimilar to that case. And I noticed that you cited the Valdez-Vega case as your support for saying this is enough, this is enough suspicion. But in Valdez-Vega, there was a lot more information about what was going on in the case. Your Honor, I think that Valdez-Vega was a little bit different. There was more suspicious driving. But there is some significance to the fact that this car stopped in front of a suspected stash house for at least 20 minutes. The Second Circuit's decision in Martinez-Gonzalez pretty squarely holds that depending on the quantum of evidence you have about whether or not a residence is a stash house, there could be reasonable suspicion to stop anyone coming out of that house. This is quite a different situation than when someone is stopped in, like, a general high-crime neighborhood on a high-crime street. This is a specific house for which agents had had under surveillance for two or three weeks and had made a number of or had made an arrest coming from that surveillance and had seen a number of what they believed to be undocumented immigrants. Had the agents been able to tie Saviano to this house? They did not know Saviano was in the car before. I know they didn't know that Saviano was in the F-150. Did they know? Had they tied him to this particular house, though? The record wasn't clear exactly how they stopped him, but it does say that they stopped him several blocks away from that house with the same team of agents that were surveilling. Had they ever seen him at the house or going in and out of the house? No. But it was the same team of agents that were surveilling both the B and G Street houses, and they made that stop several blocks away. So I think they believed that he was associated with that house as well. Was he tied to the B Street house? The record isn't clear which house he was tied to. The only other issue that I wanted to address is there was some issue below about the collective knowledge doctrine, what Agent Whitelm saw. But as we sort of explained in our brief, we're not relying on that here. We believe that the circumstances of the stop, the stash house, the walking back and forth in front of the house once they got there and departed on S2, are enough to support reasonable suspicion here.  They never saw anybody get in that truck, right, in the F-110? They did not. And they were looking right at it and didn't see anybody going from the stash house where they believed people were and into the F-110? Correct. And they saw Saviano going from the stash house and into the F-110, but nobody else? And that's what they were saying the criminal activity was, was related to smuggling, correct? Correct. And I do have two responses to that. Go ahead. The first is after, after Saviano and Aguilero were arrested, they did say that the undocumented immigrants were loaded into the car at that house. So just because the agents didn't see it doesn't mean that it didn't happen. And second, the report. Yeah, yeah. But that's after the stop. This is, this is what they know before the stop. Correct. But I will also, as to that, I will also say that the agents were radioing out as soon as the truck left the house that they believed that it could have been loaded up the house. And that was because the truck, the truck was parked in front of the house in such a way that they weren't sure whether or not they caught everyone else coming out. And again, That's just speculation. They didn't have any reason to believe that other than the truck was parked there. The truck was parked there and they couldn't see whether or not someone was coming out of the house into the car. That would mean anybody that was parked there would have, they would have reasonable suspicion to believe that. Depending on the angle of which their parking, what the agents could see at that point. Perhaps. Yes. Well, any, any angle that they couldn't actually see the front door and the trail to the car would create from your perspective, reasonable suspicion to stop. I agree. But again, we have a little bit more than that here and that they went to S2, which is the smuggling route connected to this particular house. Right. Thank you. And remind me how we connect the S2 to this particular house. So two weeks before, two weeks before this stop, Saviano was arrested based on the surveillance of the B and G street houses. Right. But when I asked you whether they had tied Saviano to this house, you told me that they couldn't tie him to this house. Correct. I don't know. They could tie him to the area, but they couldn't tie him to this house. Correct. And so just to draw up the links, it was, there were two houses under surveillance B and G street. Sure. I'm not aware of which house Saviano was connected to, but the agents believe that that was the same smuggling organization based on the fact that people from the B street house went to the G street house. And that's in fact how surveillance in the G street house started. You said at the beginning that, that when, and when I asked you about the suspicious activity out in front, the district court didn't make any finding on that. Can we take their lack, the district court's lack of a finding on that to say from their, that district court judge's perspective, it didn't exist. No, Your Honor. And frankly, that was, you know, we didn't emphasize that argument below and that's, that's why the district court didn't make that finding. But those facts, they were never disputed. The only dispute during the evidentiary hearing was whether or not agent Woodhull had been able to see people in the back of the truck. Then we become fact finders at this level. To a certain extent, except for those facts were undisputed. They were presented as, as facts in the district and both the defenses and the prosecution's pleadings, which is why we're asking the court to rely on them here. But we, we agree that, that even if the court is reluctant to do so we still believe there's reasonable suspicion. Thank you. Thank you. Thank you, Mr. Christian Murphy, Mr. Brown. Good morning. Morning, Your Honor. Douglas Brown for Mr. Saviano. I think the, the district court and the district court made a clear, concise, precise ruling. Uh, the district court found that specifically they disbelieved the agent that testified in this case on a material fact. Um, it's pretty clear from the record. That's, that's still the silhouettes. I'm sorry, sir. This is, this is a Widholm on the silhouettes. Yes, sir. But the government says they're not relying on that fact. Well, they're not relying on it now, but they did in the district court. But they're not relying on it now. That's exactly what they said in their briefs. But I don't think that this court can ignore what the district court was considering. But even taking that, the fact of the matter is, uh, they waited an hour before they stopped this vehicle. The tapes, the dispatched tapes, which, uh, uh, were revealed indicate that the agent only stopped the vehicle because he didn't want to follow it all the way to Campo or to Boulevard. If they'd had founded suspicion because they saw somebody outside the house, they could have stopped the car within five minutes, six minutes, 10 minutes, but they didn't. Well, if they had done that, it would have blown their cover. Well, if they were going to stop the car, I mean, they could have stopped the car in five minutes and their cover would have been blown. Well, no, that would have blown their cover. That would have shown that they were, that they were, that they were watching the house. If they, if they stop at 50 miles down the road, there's less of a connection. Yeah. Like, they never made that argument in the district court. And I honestly would respectfully think that, uh, some believes a crime is being committed. They just wouldn't wait 50 minutes. I didn't see driving that far, uh, would bear any relation at all to the agents having the thought they didn't want to blow their cover. There was no testimony to that effect in the, uh, in the lower court. No one's ever made that argument. What was following them were the unmarked cars. The unmarked cars were fine. That's correct. Right. And they had to actually signal to get marked cars. Yes, but they didn't signal for about 40 minutes. So if they'd had founded suspicion, they could have called at any time. They could have asked the patrol to come and wait for it. I'm not sure what, I'm not sure what, what your point goes to. That the, well, the witness, I'm not sure what, I'm not sure what the delay proves. It, it, it leaves a reasonable inference that there was no founded suspicion because had there been founded suspicion, they would have stopped the vehicle long before 50 minutes or an hour and they wouldn't have stopped the vehicle right after saying they didn't want to follow it all the way to Campo on Boulevard. The dispatch makes it clear they did not want to continue this pursuit and that they didn't have any reason to stop the car. That's a reasonable inference. And so the car proceeded. They couldn't find anything. They got tired. As the agent said on the tape, he didn't want to go all the way to Campo Boulevard like he did the last time. This sucks. Okay. To me, that makes it pretty clear why they were stopping the car. In addition to that, the government never called the individual. Agent Alexander was the one purportedly that made the decision to stop the car. He wasn't called by the government. The government didn't call anyone to testify as seeing any of this activity outside the house. So I think the general rule is you review the findings in light most favorable to the prevailing party and only reverse for clear factual error. I don't see any basis for clear factual error. I think the government has the burden. They haven't met it. They didn't meet it in the district court. And I would respectfully request that the court affirm Judge San Martino's decision. Thank you. Thank you, Mr. Brown. Mr. Christian Murphy, you've got time remaining if you wish it. I just like to make one very brief point, which is I don't think the fact that Border Patrol followed this car for an hour makes me have suspicion. What does the fact that they clocked the car going at 90 miles an hour prove? It's actually not clear that they clocked that car going at 90 miles an hour. The Border Patrol agent testified that they were going 90 miles an hour at different points to try to catch up. But I don't think there was any specific testimony about how fast the defendant's car was going. There was an inference that they were going fast because Border Patrol had to go fast to catch up. Unless the court has any further questions, I'm happy to submit. Thank you. Okay. Thank you. Thank you. Thank both counsel. United States v.
judges: Gould, Bybee, Hernandez